**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CHRISTOPHER ZIMMER, SR.** and **NICOLE ZIMMER**, : <br> : <br> Plaintiffs, : <br> : <br> v. : <br> : <br> **THE NEW JERSEY DIVISION OF CHILD PROTECTION AND PERMANENCY, LISA VON PIER**, in her official capacity as the Director of the New Jersey Division of Child Protection and Permanency and the Assistant Commissioner of the New Jersey Department of Children and Families, **ALLISON BLAKE**, in her official capacity as the Commissioner of the New Jersey Department of Children and Families, **MONIQUE DYKES**, in her individual capacity, and **MICHELLE MARCHESE**, in her individual capacity, : <br> : <br> Defendants. : | Civ. Action No. 15-2524 (FLW) (DEA) <br><br> **OPINION** |

**WOLFSON, United States District Judge:**

Plaintiffs Christopher Zimmer, Sr. and Nicole Zimmer (collectively, "Plaintiffs") bring the instant action, pursuant to 42 U.S.C. § 1983, against Defendant Michelle Marchese ("Defendant"),[1] alleging that Defendant violated Plaintiffs' Fourth Amendment rights by

---

[1] Plaintiffs' Complaint originally asserted a multitude of constitutional claims against the New Jersey Division of Child Protection and Permanency (the "DCP&P"), Lisa Von Pier, in her official capacity as Director of the DCP&P and Assistant Commissioner of the New Jersey Department of Children and Families (the "DCF"), Allison Blake, in her official capacity as Commissioner of the DCF, Monique Dykes, in her individual capacity, and Michelle Marchese, in her individual capacity. *See* Compl. However, as discussed further in the procedural history section of this Opinion, pursuant to this Court's January 20, 2016 Order, the only remaining

entering their home without a warrant and without consent. Presently before the Court is

Defendant's Motion for Summary Judgment, as well as Plaintiffs' Cross-Motion for Summary

Judgment as to liability. For the reasons that follow, Defendant's Motion is GRANTED, and

Plaintiffs' Cross-Motion is DENIED.

## I.    BACKGROUND

Defendant is a caseworker for the New Jersey Department of Division of Child

Protection and Permanency ("DCP&P"). This matter arises out of Defendant's warrantless entry

into Plaintiffs' home to investigate a child welfare referral. The following facts are undisputed,

except where noted, and are viewed in the light most favorable to Plaintiffs, the non-moving

party on Defendant's Motion for Summary Judgment.[2]

At approximately 10:00 a.m. on the morning of January 13, 2015, Defendant arrived at

Plaintiffs' home to investigate a child welfare referral that the DCP&P had received six days

earlier, regarding the homeschooling of Plaintiffs' minor son, C.Z. Deposition Transcript of

Michelle Marchese ("Marchese Dep."), at 34:16-36:6. Defendant parked her vehicle across the

street from Plaintiffs' home, traversed Plaintiffs' porch, and knocked on the front door of

Plaintiffs' home. *Id.* at 36:7-13. Mr. Zimmer answered the front door, and Defendant identified

herself as a caseworker from the DCP&P. Def.'s Statement of Material Facts ("DSMF"), ¶ 2;

---

claims are Plaintiffs' warrantless search claims against individual Defendant Marchese. *See* ECF
No. 14.
[2] Because the Court ultimately concludes that Defendant is entitled to summary judgment on all
of Plaintiffs' claims, thereby resolving the instant matter in its entirety and mooting the need to
consider Plaintiffs' Cross-Motion for Summary Judgment, the Court need not view the facts in
the light most favorable to Defendant. *See Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d
Cir. 2017) ("By proceeding with Defendants' motion first, the District Court viewed the evidence
in the light most favorable to Beenick and concluded that Defendants were entitled to summary
judgment on all of his claims. That conclusion ended the case and mooted any need to consider
Beenick's cross-motion for partial summary judgment.").

Pls.' Response to DSMF ("PRSMF"), ¶ 2.  Mr. Zimmer testified that Defendant refused to answer his questions as to why she was there; instead, Defendant informed Mr. Zimmer that she would discuss the purpose of her visit once inside the home.  Deposition Transcript of Christopher Zimmer, Sr. ("Zimmer, Sr. Dep."), at 22:12-23:3.

Following their brief conversation at the front door, Mr. Zimmer refused to allow Defendant to enter his home, stating that she did not have his consent to enter the house.  *Id.* at 23:1-13.  When pressed again by Mr. Zimmer as to the purpose for her visit, Defendant explained that she was at Plaintiffs' home to investigate the homeschooling of C.Z.  *Id.* at 30:21-31:21.  Mr. Zimmer expressed his displeasure with Defendant's visit, and noted that approximately one week earlier, a childhood acquaintance of C.Z. had threatened to call the DCP&P on the family.  Marchese Dep. 36:20-37:7.  Mr. Zimmer indicated his belief that it was this individual who had contacted the DCP&P.  *Id.* at 37:3-23.

During his deposition, Mr. Zimmer testified that after he refused to permit Defendant to enter his house, Defendant insisted that Mr. Zimmer did not have a choice, stating, "You need to let me in," Zimmer, Sr. Dep. 23:5-20, as well as asserting that Mr. Zimmer had "ten minutes to let her in or else."  *Id.* at 23:9-25.  Mr. Zimmer further testified that Defendant would not clarify what she meant by "or else."  *Id.* at 24:1-2.  Mr. Zimmer then directed Defendant to wait outside in her vehicle while he called the police.  *Id.* at 24:1-25:1; 41:23-25.  It is undisputed that Defendant did not advise Plaintiffs of their constitutional rights, either during this initial encounter or at any subsequent point during the course of Defendant's investigation.  Marchese Dep. 39:17-25; Plaintiffs' Counterstatement of Material Facts ("PCMF"), ¶¶ 15-16; Defendant's Response to PCMF ("DRMF"), ¶¶ 15-16.

Belvidere Township Chief of Police Matthew Scott responded to Mr. Zimmer's call. DSMF ¶ 5; PRSMF ¶ 5. Because Belvidere is a relatively small town, Plaintiffs were already familiar with Chief Scott prior to this incident. *Id*.; Zimmer, Sr. Dep. 25:6-17. Upon his arrival, Chief Scott spoke briefly with Defendant at her car. Deposition Transcript of Chief Matthew Scott ("Chief Scott Dep."), at 14:6-15:10. Chief Scott then approached Plaintiffs' front door and was invited inside the house, where he met with both Mr. and Mrs. Zimmer. *Id.* at 17:1-25; Zimmer, Sr. Dep. 27:4-16. During their conversation inside the home, Defendant waited outside in her vehicle. Chief Scott Dep. 17:1-25; Zimmer, Sr. Dep. 27:4-16.

Chief Scott and Mr. Zimmer offer different recollections of their conversation inside Plaintiffs' home. On one hand, Mr. Zimmer testified that Chief Scott explained to Plaintiffs that Defendant was a caseworker for DCP&P, and that he "believe[d] [Chief Scott] said to us something about she will come in and ask you a few questions or something along those lines." Zimmer, Sr. Dep. 28:3-20. Mr. Zimmer further testified that Chief Scott did not advise Plaintiffs of their rights, and told Plaintiffs "that it would be a lot easier to let [Defendant] in." *Id.* at 45:17-46:5. Chief Scott disputes Mr. Zimmer's testimony, maintaining that he did advise Plaintiffs of their rights, including their right to "deny [Defendant] entry into their residence." Chief Scott Dep. 19:10-15. Nonetheless, Chief Scott does not dispute that he advised Plaintiffs that, so long as they "had no issues," it would be "easier to let [Defendant] in. *Id.* at 19:10-15. Chief Scott further testified that Plaintiffs found his approach agreeable, and that it was his understanding that Plaintiffs would allow Defendant into their home to conduct the investigation. *Id.* at 19:10-20:21. At the conclusion of his conversation with Plaintiffs, Chief Scott explained that he was going to go back outside to speak with Defendant before departing the home.

Zimmer, Sr. Dep. 29:7-9. Mr. Zimmer offered the following testimony regarding his understanding of what Defendant would do after Chief Scott went back out to speak with her:

> Q: What was your understanding about what Michelle Marchese would then do next?
>
> Mr. Zimmer: There wasn't an understanding from me. It was either I let her in the house or I understand from my previous history of seeing things I have trouble coming, so I had to let her in the house.
>
> Q: Let me unpack that. Is that your understanding or is that the understanding communicated to you by the police officer?
>
> Mr. Zimmer: No, it is not communicated by the police officer. That is what I have seen happen and I did not want that to happen. . . .
>
> Q: Where have you seen that happen before?
>
> Mr. Zimmer: Everywhere in the world.

*Id*. at 29:10-25.

Chief Scott then left the home and spoke with Defendant outside of her vehicle. DSMF ¶ 9; PRSMF ¶ 9. Plaintiffs were not present for this conversation. *See id.* Defendant testified that Chief Scott told her that he "encouraged [Plaintiffs] to meet with [Defendant] and to comply, and that they were willing to meet with [her]." Marchese Dep. 40:16-17. Similarly, Chief Scott testified that he advised Defendant, "You can go in. They will let you in," before entering his vehicle and departing the scene without any further interaction. Chief Scott Dep. 21:14-23.

Defendant subsequently approached Plaintiffs' home for the second time and knocked on the front door, which, once again, was answered by Mr. Zimmer. Zimmer, Sr. Dep. 40:7-12. Mr. Zimmer testified that after opening the front door, Defendant just "just walked into the house," despite not having been expressly invited inside by Mr. Zimmer. *Id*. at 40:13-20. Nonetheless, Plaintiffs do not dispute that they "allowed Marchese to come into their home." PRSMF ¶ 9; DSMF ¶ 9. Once inside the home, Mr. Zimmer directed Defendant to sit at the dining room table. Zimmer, Sr. Dep. 40:21-25; 51:17-21; Marchese Dep. 41:18-25. While

seated at the table, Defendant asked a series of questions to Mr. Zimmer, Mrs. Zimmer, and C.Z. Zimmer, Sr. Dep. 51:17-52:25. Mr. Zimmer described the way that the parties interacted at the table as "conversational," and further indicated that they spoke for over an hour. *Id*. at 58:18-59:3. As she prepared to leave the home, Defendant notified Plaintiffs that she would follow up with the family regarding ways they might "tweak" their homeschooling routine. Deposition Transcript of Nicole Zimmer ("Nicole Zimmer Dep."), at 36:1-37:5.

## II.    PROCEDURAL HISTORY

On April 9, 2015, Plaintiffs filed a six-count complaint (the "Complaint") against defendants DCP&P, Lisa Von Pier, in her official capacity as Director of the DCP&P and Assistant Commissioner of the New Jersey Department of Children and Families (the "DCF"), Allison Blake, in her official capacity as Commissioner of the DCF, Monique Dykes, in her individual capacity, and Michelle Marchese, in her individual capacity. *See* Compl., ECF No. 1.

On January 20, 2016, this Court entered an Opinion and corresponding Order dismissing the majority of the claims asserted in the Complaint. ECF Nos. 13-14. Based on this Court's January 20, 2016 Opinion, the only remaining claims are Plaintiffs' § 1983 and New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-2 unreasonable search claims against Defendant Marchese, asserted in Counts Four and Six of the Complaint, respectively. *Id.* In those Counts, Plaintiffs allege that Defendant Marchese violated their constitutional rights by conducting a warrantless entry into their home without their consent. *See* Compl. ¶¶ 137-45; 155-57.

On March 31, 2017, Defendant Marchese moved for summary judgment on Counts Four and Six of the Complaint. ECF No. 26. Plaintiffs filed their opposition on June 5, 2017, ECF No. 31, and Defendant filed her reply on June 9, 2017. ECF No. 33.

## III.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322. Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson*, 79 F.3d at 1366; *see Gleason v. Norwest Mortg. Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). Not every issue of fact is sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S.

at 248. Additionally, the nonmoving party cannot rest upon mere allegations; he or she must present actual evidence that creates a genuine issue of material fact. *See* FED. R. CIV. P. 56(e); *Anderson*, 477 U.S. at 249. In conducting a review of the facts, the nonmoving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks v. Kyler*, 204 F.3d 102, 105, n.5 (3d Cir. 2000).

Finally, "[t]he standard by which the court decides a summary judgment motion does not change when the parties file cross-motions." *Clevenger v. First Option Health Plan of New Jersey*, 208 F. Supp. 2d 463, 468 (D.N.J. 2002). Each party still bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 322. "When ruling on cross-motions for summary judgment, the court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Parker v. Hanhemann Univ. Hosp.*, 234 F. Supp. 2d 478, 484–85 (D.N.J. 2002) (citing *Williams v. Philadelphia Hous. Auth.*, 834 F.Supp. 794, 797 (E.D.Pa.1993), *aff'd*, 27 F.3d 560 (3d Cir.1994)). "That one of the cross-motions is denied does not imply that the other must be granted." *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 85 F. Supp. 3d 785, 794 (D.N.J. 2015).

## IV. DISCUSSION

Defendant moves for summary judgment on Plaintiffs' Fourth Amendment claims, arguing that her entry into Plaintiffs' home was conducted reasonably and with consent, and alternatively, that she is entitled to qualified immunity because her entry did not violate clearly

established law.  In opposition, Plaintiffs contend that Defendant violated the Fourth

Amendment's prohibition against unreasonable searches by entering Plaintiffs' residence without

obtaining their voluntary consent.

### A.     Consent to Search

The Court first examines whether Defendant violated Plaintiffs' Fourth Amendment

rights by entering Plaintiffs' home without a warrant.  I begin my analysis with the relevant

constitutional text.  The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against
> unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but
> upon probable cause, supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

The relevant Fourth Amendment protection in this case is "the right to be free in one's

home from unreasonable searches and arrests."  *Pearson v. Callahan*, 555 U.S. 223, 230 (2009);

*see United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972)

(observing that "physical entry of the home is the chief evil against which the wording of the

Fourth Amendment is directed . . . .").  "It is a 'basic principle of Fourth Amendment law' that

searches and seizures inside a home without a warrant are presumptively unreasonable."  *Groh v.

Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).

However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the

warrant requirement is subject to certain exceptions."  *Brigham City, Utah v. Stuart*, 547 U.S.

398, 403 (2006).  For example, the Supreme Court has recognized exceptions to the warrant

requirement where:  (1) voluntary consent has been obtained from a person with authority over

the premises to be searched; or (2) exigent circumstances exist.  *See United States v. Karo*, 468

U.S. 705, 717 (1984) (recognizing consent and exigent circumstances as exceptions to the

warrant requirement); *see also Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (observing that the presumption that a warrantless search is unreasonable can be overcome, for example, where officials must enter a home to render emergency assistance to an injured occupant); *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006) ("There are several established exceptions to the warrant requirement, however, including exigent circumstances and consent."). In this case, Defendant does not argue that an exigency justified the search; rather, Defendant seeks to invoke the consent to search exception to the warrant requirement. Accordingly, this Court's analysis centers solely on the issue of whether Plaintiffs voluntarily consented to Defendant's entry into their home.

It is well-established that the Fourth Amendment's prohibition against warrantless searches does not apply "to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (internal citation omitted); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); *United States v. Stabile*, 633 F.3d 219, 230–31 (3d Cir. 2011). The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991).[3]

---

[3] In *Fernandez v. California*, 134 S. Ct. 1126 (2014), the Court discussed the purposes animating the consent to search doctrine within the context of home searches:

> It would be unreasonable—indeed, absurd—to require police officers to obtain a warrant when the sole owner or occupant of a house or apartment voluntarily consents to a search. The owner of a home has a right to allow others to enter and examine the premises, and

To justify a search based on consent, the government official has the burden of proving that the consent was voluntarily given. *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). To that end, consent "is ineffective if extracted by the state under threat of force or under claim of government authority." *Good v. Dauphin Cty. Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1093 (3d Cir. 1989); *see Schneckloth*, 412 U.S. at 233 ("[I]f under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then we have found the consent invalid and the search unreasonable."). "There is no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Price*, 558 F.3d at 278 (internal quotation marks and citation omitted). Rather, voluntariness is "a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. "Factors to consider include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *Price*, 558 F.3d at 278.

---

there is no reason why the owner should not be permitted to extend this same privilege to police officers if that is the owner's choice. Where the owner believes that he or she is under suspicion, the owner may want the police to search the premises so that their suspicions are dispelled. This may be particularly important where the owner has a strong interest in the apprehension of the perpetrator of a crime and believes that the suspicions of the police are deflecting the course of their investigation. An owner may want the police to search even where they lack probable cause, and if a warrant were always required, this could not be done. And even where the police could establish probable cause, requiring a warrant despite the owner's consent would needlessly inconvenience everyone involved—not only the officers and the magistrate but also the occupant of the premises, who would generally either be compelled or would feel a need to stay until the search was completed.

*Id.* at 1132.

Additional factors include the "the setting in which the consent was obtained," as well as "the parties' verbal and non-verbal actions." *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003).

While the aforementioned factors guide this Court's analysis of whether consent was given, the ultimate question is whether, based on the totality of the circumstances, Defendant had an objectively reasonable basis for believing there was consent to search. *See Jimeno*, 500 U.S. at 251 ("The standard for measuring the scope of [an individual's] consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the [individual]."); *Rodriguez*, 497 U.S. at 188 (observing that the "determination of consent to enter must be judged against an objective standard."); *United States v. Walker*, 529 F. App'x 256, 263 (3d Cir. 2013) ("A court is to measure the scope of a suspect's consent using an objective standard to determine what a reasonable person would have understood from the exchange between the officer and the defendant."). To that end, even where an official does not in fact obtain consent, the Fourth Amendment is satisfied where the official "had a reasonable basis for believing that there had been consent to the search." *United States v. Sanchez*, 32 F.3d 1330, 1334 (8th Cir. 1994); *see, e.g.*, *Seifert v. Rivera*, 933 F. Supp. 2d 307, 316 (D. Conn. 2013) (holding that "it was objectively reasonable for the [officials] to believe that [the plaintiff] had consented to their entry when she stepped backwards from the open door," even if the plaintiff did not in fact intend to consent to the search).

In this case, Plaintiffs concede that the sole issue pertaining to the instant Motion is whether Plaintiffs' consent to search was coerced. *See* Pls.' Opp. to Def.'s Mot. for Summ. J., 1

("Only the issue of consent versus coercion is materially in dispute in this motion.").[4] Plaintiffs maintain that their consent to search in this case was coerced, because: (1) it was procured as the result of Defendant's threatening statements upon her initial encounter with Plaintiffs; and (2) genuine issues of fact exist regarding the substance of the conversation between Plaintiffs and Chief Scott. Accordingly, the central issue for this Court is whether it was objectively reasonable, based on the totality of the circumstances, for Defendant to believe that she had consent to enter Plaintiffs' home, and, whether the consent was given voluntarily.

At the outset, the Court finds unpersuasive Plaintiffs' argument that, in light of Defendant's statements to Plaintiffs during their initial encounter, Plaintiffs' consent was coerced. According to Plaintiffs' depiction of the facts, upon Defendant's initial arrival to the home, Mr. Zimmer and Defendant briefly discussed the purpose of her visit, and Mr. Zimmer refused to allow Defendant to enter Plaintiffs' home. Zimmer, Sr. Dep. 22:12-23:4. Mr. Zimmer testified that Defendant responded to his refusal to consent by explaining that Mr. Zimmer did not have a choice, stating, "You need to let me in," and that Mr. Zimmer had "ten minutes to let her in or else." *Id*. at 23:5-25. Nonetheless, following those alleged statements, it is undisputed

---

[4] The Court notes that in their Opposition to Defendant's Motion for Summary Judgment, Plaintiffs maintain that, once inside Plaintiffs' home, Defendant asked questions "unrelated" to her homeschooling investigation. Pls.' Opp. to Def.'s Mot. for Summ. J., 8. For example, Defendant asked C.Z. what he wanted to be when he grew up, and, after C.Z. responded that he wanted to be a Marine scout sniper, Defendant asked him whether he liked to play the video game Call of Duty. Marchese Dep. 51:1-17. "When an official search is properly authorized— whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization." *Walter v. United States*, 447 U.S. 649, 656 (1980). As with determining whether consent was given, the "standard for measuring the scope of a person's consent is 'objective reasonableness.'" *Reedy v. Evanson*, 615 F.3d 197, 225 (3d Cir. 2010) (quoting *Jimeno*, 500 U.S. 248, 251 (1991)). Here, in light of the Plaintiffs' express assertion that only the issue of coercion is in dispute, the Court need not reach the issue of whether Defendant's questioning exceeded the scope of the consent given. Nonetheless, the Court comments, without finding, that it appears that Defendant's questions were consistent with a homeschooling investigation.

that Mr. Zimmer again refused to allow Defendant to enter the home, and directed Defendant to wait outside in her car while Mr. Zimmer called the police.  *Id.* at 24:1-25:1.

Even accepting as true Mr. Zimmer's account of the initial encounter, I cannot find that Defendant's allegedly threatening statements rendered her subsequent belief that Plaintiffs had consented to her entry objectively unreasonable, because it is undisputed that Mr. Zimmer expressly refused to consent even *after* Defendant's statements.  In that regard, at least one Courts of Appeal has held that, where an individual initially refuses consent to search, but subsequently consents, only the events following the individual's initial refusal are relevant to the voluntariness determination.  *See United States v. Welch*, 683 F.3d 1304, 1309 (11th Cir. 2012) ("A person who actually says 'no' has not been coerced into saying 'yes.'  Thus at least up to the time Welch refused to consent, he cannot be said to have been coerced into consenting involuntarily. That leaves, for analysis of coercion and voluntariness, what happened after he said 'no.'"); *see also United States v. Thame*, 846 F.2d 200, 204 (3d Cir. 1988) (upholding a consensual search conducted after the defendant's initial refusal to consent, where the initial refusal to consent was honored, and circumstances following the defendant's refusal indicated that the subsequent consent was "freely given."); *United States v. Collins*, 699 F.3d 1039, 1042 (8th Cir. 2012) (finding that a reasonable police officer could conclude that the defendant voluntarily consented to the officer's entry, despite the defendant's initial refusal to consent, where circumstances following the refusal did not indicate the presence of coercion).  In *Welch*, for example, the 11th Circuit affirmed the lower court's finding that the occupant had voluntarily consented to a search of his apartment, despite his initial refusal to consent to the search.  *See id.* at 1309.  In that case, several officers approached the occupant with guns drawn, and asked the occupant for his consent to search his apartment.  *Id.* at 1306.  The occupant refused to consent,

but later recanted his refusal after several minutes had passed by and the occupant spoke with one of the officers. *Id.* In finding that the occupant voluntarily gave his consent, the *Welch* court excluded from its analysis any consideration of the events preceding the occupant's initial refusal to consent, including the fact that the officials approached the occupant and asked for consent with guns drawn. *Id.* at 1309. The court reasoned that the occupant "must not have felt coerced into consenting when they first asked, because he declined to consent," and therefore, confined its voluntariness determination to the events occurring after the defendant refused consent. *Id.* I find that reasoning persuasive here, and have not located any Third Circuit law to the contrary.

Similarly, here, because Mr. Zimmer refused to consent *after* Defendant's alleged threats, it follows that Mr. Zimmer's refusal clearly indicates that he must not have felt coerced by Defendant's alleged statements. Accordingly, the Court will not consider Defendant's allegedly threatening declarations in its voluntariness determination, and will focus instead on the events occurring after Mr. Zimmer's initial refusal to consent.

The Court is also not persuaded by Plaintiffs' argument that they were coerced into consenting to the search based on the actions of Chief Scott. In the Court's voluntariness determination, it is important to distinguish the conduct of Chief Scott from that of Defendant. While there may be a dispute of fact as to whether Chief Scott took coercive actions in procuring Plaintiffs' consent,[5] it is undisputed that Chief Scott's conversation with Plaintiffs occurred

---

[5] Even if the Court were to consider Chief Scott's conversation with Plaintiffs, it could not conclude that Plaintiffs' consent was coercively obtained as a result of that conversation. Principally, Mr. Zimmer admitted that while he felt that he had no choice but to let Defendant enter his home, that understanding was based on Mr. Zimmer's general experience of what he has seen happen "[e]verywhere in the world," rather than on what had been "communicated by [Chief Scott]." Zimmer, Sr. Dep. 29:16-25. Additionally, although Mr. Zimmer testified that Chief Scott advised Plaintiffs that it would be easier to let Defendant in, *id.* at 45:17-46:5, that he could not do anything about the fact that Defendant was there, *id.* at 28:12-13; and that "she will come in and ask you a few questions," *id.* at 28:14-16, the Court cannot find that those

while Defendant was waiting outside in her vehicle, and nothing in the record suggests that Chief

Scott informed Defendant that he had made any coercive statements in procuring Plaintiffs'

consent.  Because the Court's analysis is limited to whether it would be objectively reasonable

for an official in Defendant's position to believe that Plaintiffs consented to the search, and

because Chief Scott's conversation with Plaintiffs occurred outside of Defendant's purview, that

conversation does not inform the voluntariness analysis.

 Turning to the events occurring after Chief Scott's conversation with Plaintiffs, the Court

finds that, based on the totality of the circumstances, Defendant had a reasonable basis for

believing that there was consent to enter Plaintiffs' home.  To that end, Defendant testified, and

Plaintiffs do not dispute, that, following Chief Scott's conversation with Plaintiffs, Chief Scott

proceeded to Defendant's vehicle, and explained to Defendant that he "encouraged [Plaintiffs] to

meet with [Defendant] and to comply, and that they were willing to meet with [Defendant]."

Marchese Dep. 40:16-17.  Chief Scott confirmed as much during his deposition, testifying that

he relayed Plaintiffs' concerns regarding the source of the inadequate homeschooling tip, and

advised Defendant, "You can go in.  They will let you in," before departing the scene without

any further interaction.  Chief Scott Dep. 21:14-23.[6]  Based on Chief Scott's unequivocal

_____

statements constitute a "claim of lawful authority."  *Schneckloth*, 412 U.S. at 233.  This is
particularly so in light of the fact that Plaintiffs, rather than Defendant, summoned Chief Scott to
the home.

[6] While Defendant was aware that Chief Scott "encouraged" Plaintiffs to comply, it would strain
credulity to charge Defendant with knowledge of coercion solely on that basis, because mere
encouragement is insufficient to overbear an individual's will.  Although the circumstances may
be different if, for example, Chief Scott had informed Defendant that he had advised Plaintiffs
that they had no choice but to let Defendant in, or affirmatively asserted the right to enter under
the color of law, here, instead, Chief Scott's statements to Defendant could not reasonably
inform Defendant that Plaintiffs only permitted the search under threats or force.  Indeed, as the
Court has already discussed, Mr. Zimmer expressly refuted the notion that his understanding that
he had no choice but to let Defendant enter the home stemmed from his conversation with Chief
Scott.  Zimmer, Sr. Dep. 29:10-21.

statement to Defendant regarding Plaintiffs' consent, as well as the lack of any other indicia that Defendant was aware, or reasonably should have been aware, that Chief Scott may have obtained Plaintiffs' consent under coercive circumstances, the Court cannot find that, upon approaching Plaintiffs' home for the second time, it was objectively unreasonable for Defendant to believe that Plaintiffs consented to her entry.

Moreover, Plaintiffs' conduct upon Defendant's subsequent approach and entry into the home further evinces that it was objectively reasonable for Defendant to believe that Plaintiffs consented to the entry. Upon reaching the home for the second time, Mr. Zimmer answered the front door. Zimmer, Sr. Dep. 50:7-15. While Mr. Zimmer testified that he felt he "had to let her in," the record is devoid of any evidence indicating that Defendant demanded entry, forced entry, or that Mr. Zimmer attempted, either verbally or non-verbally, to deny her entry. *Id*. at 40:7-20. To the contrary, Mr. Zimmer testified that no words were exchanged on the second encounter; rather, Mr. Zimmer simply opened the door and Defendant walked into the house, albeit without Mr. Zimmer having affirmatively invited her in. *Id*. at 40:14-20. Nonetheless, Plaintiffs concede that they "allowed Marchese to come into their home." PRSMF ¶ 9; DSMF ¶ 9. Based on that testimony, the Court cannot conclude that a reasonable official would have understood Plaintiffs' conduct, upon Defendant's second encounter at the home, as either nonconsensual or as a revocation of Plaintiffs' previous consent given to Chief Scott.

Additionally, the Court cannot find that Mr. Zimmer's silence and failure to affirmatively invite Defendant into the home rendered Defendant's belief that Plaintiffs consented to her entry objectively unreasonable. To that end, consent need not be express, but may be implied from an individual's non-verbal conduct. *See Reppert v. Marino*, 259 F. App'x 481, 492 (3d Cir. 2007); *see also United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010) ("[I]t is well settled that

consent may be inferred from an individual's words, gestures, or conduct. Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'") (citation omitted).  Here, Defendant approached Plaintiffs' front door under the reasonable belief, as a result of Chief Scott's statement, that Plaintiffs consented to her entry.  Additionally, Mr. Zimmer's subsequent conduct in opening the door, allowing Defendant to enter without objecting or revoking any consent previously given to Chief Scott, and directing Defendant to sit at the dining room table, only buttressed Defendant's belief that Plaintiffs consented to the search.  Indeed, several courts have held that it is reasonable for an official to infer consent from an individual's non-verbal acquiescence to the official's entry into the individual's residence.  *See*, *e.g.*, *Grant*, 375 F. App'x at 80 (finding that there was implied consent, where occupant admitted officers into his building, turned to his apartment, and entered the apartment "without impediment or objection to the entry of the police."); *Seifert*, 933 F. Supp. 2d at 312 (finding that there was an objectively reasonable basis for officers to imply consent, despite the occupant's failure to verbally invite the officers inside her home, where the occupant answered the door, did not object to the officers' entry when they came in, shut the door behind them, and, once inside, asked them to sit in the living room.).  Thus, given the totality of the circumstances, an objectively reasonable official in Defendant's position would have understood Plaintiffs' conduct, during Defendant's second encounter at the home, as further demonstrating that Plaintiffs consented to Defendant entering their home.

Moreover, the Court cannot conclude that an objectively reasonable official would have perceived Plaintiffs' conduct inside the home as a refusal to consent.  In that regard, it is undisputed that, once inside the home, Mr. Zimmer directed Defendant to sit at the dining room table.  Zimmer, Sr. Dep. 51:17-21; Marchese Dep. 41:18-25.  While seated at the table,

Defendant posed a series of questions to Mr. Zimmer, Mrs. Zimmer, and C.Z. Zimmer, Sr. Dep. 51:17-52:25. Mr. Zimmer described the way that the parties interacted at the table as "conversational," and further indicated that the parties spoke for over an hour. *Id.* at 58:18-59:3. Additionally, the record is devoid of evidence suggesting that Plaintiffs verbally objected to Defendant's entry at any time, by, for example, stating they did not consent to the search or that they were only consenting because they felt compelled to do so. Under these circumstances, it was objectively reasonable for Defendant to continue to believe that Plaintiffs consented to her entry.

Finally, Plaintiffs' argument that they feared C.Z. would be removed from their home if they did not permit Defendant to enter is unavailing. Because the voluntariness inquiry focuses on the coercive conduct of state officials, the relevant inquiry is whether the conduct of Defendant either explicitly or implicitly coerced Plaintiffs into consenting to Defendant's entry; the subjective fears of Plaintiffs are insufficient to vitiate otherwise valid consent. *See United States v. Coates*, 462 F. App'x 199, 203 (3d Cir. 2012) ("The scope of consent is measured by what a 'typical reasonable person [would] have understood by the exchange between the officer and the subject,' not the [consenting party's] subjective intent."); *see*, *e.g.*, *Southerland v. Garcia*, 483 F. App'x 606, 608 (2d Cir. 2012) (finding that the plaintiff's subjective belief, "based on a discussion with a neighbor, that failure to consent could lead to loss of her employment with the City" did not factor into the court's voluntariness determination, because courts "assess . . . consent on an objective basis."); *United States v. Lopez-Rodriguez*, 396 F.3d 956, 960 (8th Cir. 2005) (finding that the officers validly obtained consent, despite the occupant's "unvoiced, subjective feelings about whether she could decline the officers' request to search the apartment, [because] the officers reasonably believed that [the occupant]

voluntarily consented to the search of the apartment."); *Phillips v. Cty. of Orange*, 894 F. Supp. 2d 345, 371 (S.D.N.Y. 2012) ("[T]he fact that the Parent Plaintiffs subjectively feared certain repercussions if they did not give their consent, without more, is insufficient to demonstrate that their consent was not voluntary.")  Here, although Mr. Zimmer testified that he subjectively feared that C.Z. would be removed from Plaintiffs' home if they did not consent to the search, Plaintiffs have not alleged that either Defendant or Chief Scott threatened removal.  Zimmer, Sr. Dep. 30:3-31:1.  Accordingly, Plaintiffs' unvoiced, subjective belief that C.Z. would be removed from their house if they did not comply with the search, without more, is insufficient for this Court to find that Defendant's belief that Plaintiffs consented to the search was unreasonable.

In short, based on the totality of the circumstances confronting Defendant, it was reasonable for her to believe that Plaintiffs consented to her entry:  Defendant was expressly told that Plaintiffs consented to the search; Mr. Zimmer allowed Defendant to enter the home without objecting or attempting to block her entrance; Mr. Zimmer directed Defendant to sit at the dining room table; once inside, the parties spoke in a conversational tone; and nothing in the record suggests that Plaintiffs asked Defendant to leave at any point during her investigation.  The Court reiterates that the inquiry under the Fourth Amendment is one of objective reasonableness, looking to whether a reasonable person under the circumstances would have understood an occupant's verbal and non-verbal conduct as indicating consent.  *See Jimeno*, 500 U.S. at 251. The objective reasonableness analysis recognizes that leeway must be provided for mistakes of officials, so long as those mistakes are reasonable.  *See Rodriguez*, 497 U.S. at 185 (observing that, what is required of an official to satisfy the reasonableness requirement of the Fourth Amendment in conducting a search under the consent exception is not that the official "always be correct, but that they always be reasonable."); *see also Brinegar v. United States*, 338 U.S.

160, 176 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part."). Here, under the totality of the circumstances, it was objectively reasonable for Defendant to believe that Plaintiffs voluntarily consented to her entry into the home, even if that was not in fact Mr. Zimmer's intent when he opened the door for Defendant. Accordingly, summary judgment in favor of Defendant is warranted, because Defendant's warrantless entry was not unreasonable under the Fourth Amendment.

### B. Qualified Immunity

Defendant also argues that she is entitled to the protection of qualified immunity, because her actions in believing that Plaintiffs consented to her entry were reasonable and did not violate clearly established law. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson*, 555 U.S. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity thus protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and applies regardless of whether the official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh*, 540 U.S. at 567 (Kennedy, J., dissenting).

Courts engage in a two-step analysis to determine whether an official is entitled to qualified immunity. First, the Court must determine whether the official's conduct violated a statutory or constitutional right. *Pearson*, 555 U.S. at 232; *Mammaro v. New Jersey Div. of*

*Child Prot. & Permanency*, 814 F.3d 164, 168-69 (3d Cir. 2016). Second, the Court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232; *Estep v. Mackey*, 639 F. App'x 870, 873 (3d Cir. 2016). The Court has discretion to approach these steps in the sequential order that it deems "most appropriate for the particular case before [it]." *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015); *see Pearson*, 555 U.S. at 236. Here, for the reasons already discussed, it was objectively reasonable for Defendant to believe that she had been given consent to enter Plaintiffs' home, and therefore, an objectively reasonable official in Defendant's position would believe that her actions in entering Plaintiffs' home with consent did not violate the Fourth Amendment. Even if Defendant made a mistake of fact as to whether consent was actually given, because that mistake was reasonable, Defendant would still be shielded by qualified immunity. *See Pearson*, 555 U.S. at 244 ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."); *Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.").

Additionally, turning to the second step of the qualified immunity analysis, the Court finds that the right at issue in this case was not clearly established. A right is clearly established where, at the time of the challenged conduct, the contours of the right are "sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). In other words, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

*Saucier*, 533 U.S. at 202. While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Stated differently, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001). "Such precedent must come either from the Supreme Court or a 'robust consensus of cases of persuasive authority in the Court of Appeals.'" *In Re: J & S Properties, LLC*, No. 16-3366, 2017 WL 4294065, at *4 (3d Cir. Sept. 28, 2017) (quoting *Mammaro*, 814 F.3d at 69).

Within the context of warrantless home searches, the Supreme Court has held, in a decision predating the conduct at issue in this case, that "[n]o reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." *Groh*, 540 U.S. at 564. Nonetheless, both the Supreme Court and the Third Circuit have repeatedly instructed courts "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742; *see Pauly*, 137 S. Ct. at 551–52; *Mackey*, 639 F. App'x at 873. "Rather, the right at issue must be framed 'in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition.'" *Mackey*, 639 F. App'x at 873 (quoting *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015)). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

In *Anderson*, for example, the Supreme Court held that the Court of Appeals erred in defining the clearly established law pertaining to the plaintiff's Fourth Amendment warrantless

search claim at too high a level of generality. *See* 483 U.S. at 640 (criticizing the Court of Appeals' discussion of qualified immunity as consisting "of little more than an assertion that a general right [the agent] was alleged to have violated—the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances—was clearly established."). In that case, the plaintiff alleged that his Fourth Amendment rights were violated when an agent of the Federal Bureau of Investigation conducted a warrantless search of the plaintiff's home, under the mistaken belief that a man suspected of a bank robbery might be found there. *See id.* at 637. The Court of Appeals rejected the agent's qualified immunity defense, holding that the "the right [the agent] was alleged to have violated—the right of persons to be protected from warrantless searches of their home unless the searching officers have probable cause and there are exigent circumstances—was clearly established." *Id.* at 638. In reversing the Court of Appeals' finding on qualified immunity, the *Anderson* Court stressed the importance of defining the clearly established right with particularity, observing:

> [W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in

public officials' effective performance of their duties,' by making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.' It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id*. at 639–40.

Applying those principles, the *Anderson* Court found that the Court of Appeals' broad formulation of the relevant legal right – as the right to be free from a warrantless search, absent probable cause and exigent circumstances – failed to account for the objective reasonableness of the agent's actions. *See id.* at 641 ("[T]he determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials."). Rather, in determining whether the agent was entitled to qualified immunity, the *Anderson* Court found that the relevant particularized inquiry was "the objective (albeit fact-specific) question whether a reasonable officer could have believed [the agent's] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Id.*

As I read *Anderson* and its progeny, the Court's inquiry at the second step of the qualified immunity analysis is twofold. First, the Court must analyze whether the particular Fourth Amendment right at issue in this case was clearly established at the time of Defendant's conduct, such that it would have been clear to a reasonable official that, under the circumstances encountered by Defendant, Defendant's conduct was unlawful. *Mullenix*, 136 S. Ct. at 308. While a directly analogous case is not required for the official to be charged with knowledge of

the unlawfulness of his or her conduct, the Third Circuit "require[s] some but not precise factual correspondence." *Bennis v. Gable*, 823 F.2d 723, 733 (3d Cir. 1987) (quoting *Three Mile Island v. Nuclear Reg. Comm'rs*, 747 F.2d 139 (3d Cir. 1984)). Second, even where reasonable officials "clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if based on the information available to them they could have believed their conduct would be consistent with those principles." *Good*, 891 F.2d at 1092; *Couden*, 446 F.3d at 492 ("'If the officer's mistake as to what the law requires is reasonable,' the officer is entitled to qualified immunity.") (quoting *Saucier*, 533 U.S. at 205).

In this case, the question becomes whether clearly established law, as of January 13, 2015, would have put a reasonable caseworker in Defendant's position on notice that a warrantless entry into Plaintiffs' home, under the circumstances confronting Defendant, violated Plaintiffs' Fourth Amendment rights. Stated differently, the question is whether a reasonable caseworker would have known that it was unlawful to conduct a warrantless entry into Plaintiffs' home, where: (1) consent to search was given by Plaintiffs to a police officer that Plaintiffs had summoned; (2) the consent was given to the officer outside of the caseworker's presence, and communicated to the caseworker by the officer; and (3) the consent was given in the setting of a child welfare investigation.

Neither Plaintiffs nor Defendant has cited relevant case law addressing this precise scenario. Moreover, in conducting its own research, this Court has not found any applicable Supreme Court precedent, or a "robust consensus of cases of persuasive authority" in the Court of Appeals, that clearly establish the right alleged to have been violated in this case. *Mammaro*, 814 F.3d at 69. Accordingly, the Court finds that it is far from clear that every reasonable

caseworker in Defendant's position would have known that a warrantless entry into Plaintiffs' home, under the particular facts of this case, violated the Fourth Amendment.

While Plaintiffs maintain that two cases addressing a social worker's warrantless entrance into a home, *Good v. Dauphin Cty. Soc. Servs. for Children & Youth*, 891 F.2d 1087 (3d Cir. 1989) and *Bostrom v. New Jersey Div. of Youth & Family Servs.*, 969 F. Supp. 2d 393 (D.N.J. 2013),[7] establish the existence of coercion in this case, those cases are factually distinguishable from the present matter, and thus, do not constitute clearly established law applicable to this case.[8] In *Good*, the Third Circuit held that a caseworker and a police officer were not entitled to summary judgment on qualified immunity grounds, because a material dispute of fact existed as to whether the plaintiff consented to the officials' warrantless entry into her home to investigate a report of child abuse, and the consent to search exception to the warrant requirement was clearly established. *See* 891 F.2d at 1089. In that case, a social services agency received an anonymous tip that a child had bruises on her body, which the child indicated were caused by a fight with her mother. *Id.* at 1089. When the child failed to appear at

---

[7] At the outset, the Court notes that *Bostrom* is a district court case, and thus, was not clearly established law that a reasonable official should have been aware of at the time of Defendant's conduct. *See Mammaro*, 814 F.3d at 69 (finding that, in determining whether a right is clearly established, the court must examine whether, at the time of the defendant's conduct, there was sufficient precedent, coming from either the Supreme Court or a robust consensus of cases in the Court of Appeals, to put the defendant on notice that his or her conduct was constitutionally prohibited).

[8] To the extent that Plaintiffs maintain that *Good* and *Bostrom* stand for the proposition that the threat of a child welfare investigation necessarily renders a parent's consent to a home search involuntary, that argument has previously been rejected by the Third Circuit. *See Hatfield v. Berube*, No. 17-2354, 2017 WL 4334044, at *3 (3d Cir. Sept. 29, 2017) ("[Plaintiff] consented to the inspection when Berube suggested that Hatfield's children possibly could be removed from her custody. But it was not sufficiently clear, either from Supreme Court precedent or a 'robust consensus of . . . persuasive authority' in the Courts of Appeals, that consent under these circumstances was coerced.") (internal citation omitted).

school the following day, the agency dispatched the caseworker and police officer to the plaintiff's home. *Id.* The officials arrived at approximately 10:00 p.m., knocked loudly on the door, announced that they had received a report of child abuse, and stated that the plaintiff "must let them enter." *Id.* at 1089-90.

Although the plaintiff demanded to see a warrant or a court order on two occasions, the caseworker informed her that no warrant was needed and she had to let them in, and the officer told his supervisor by radio, in the plaintiff's presence, that "they were going into [the plaintiff's home]." *Id.* at 1090. Only then did the plaintiff allow the officials to enter, explicitly "telling them that she did so only because she understood that she was being compelled to do so." *Id.* After entering the home, the caseworker strip searched the plaintiff's child. *Id.* The plaintiff continued to verbally protest the officials' warrantless entry throughout the pendency of the search. *Id.*

The Third Circuit held that the officials were not entitled to summary judgment on the issue of qualified immunity, because a reasonable officer under the circumstances "could not have believed [the plaintiff] had given legally effective consent to either the entry or the subsequent strip search." *Good*, 891 F.2d at 1095. In reaching that conclusion, the Third Circuit reasoned that the law governing warrantless searches in the context encountered by the officials in that case was clearly established:

> In this case the 'contours of the right[s]' relied upon by the plaintiffs were sufficiently well established in April of 1987 that [the officials] should have known what the Constitution required of them. The decided case law made it clear that the state may not, consistent with the prohibition of unreasonable searches and seizures found in the Fourth and Fourteenth amendments, conduct a search of a home or strip search of a person's body in the absence of consent, a valid search warrant, or exigent circumstances. Under that caselaw, not only the protected privacy interests but also the exculpatory concepts of 'consent' and 'exigent circumstances' in this context were well defined.
>
> . . .

While even an intrusion of the magnitude involved in a search of one's home and a strip search of one's body is constitutional if the state secures consent, the consent required must be freely given. It is ineffective if extracted by the state under threat of force or under claim of government authority. The Supreme Court reviewed its cases on this subject in *Schneckloth v. Bustamonte* and summarized the law as follows:

> [I]f under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then we have found the consent invalid and the search unreasonable.

*Id*. at 1092-93 (quoting *Schneckloth*, 412 U.S. at 233). The Third Circuit held that no reasonable officer applying the facts confronting the officials to that precedent could reasonably conclude that the plaintiff voluntarily consented to the entry or search, because: (1) the officials disregarded the plaintiff's requests for a warrant, informing her that she had to let them in; (2) the officer told her supervisor, in the plaintiff's presence, that they were going into the home; (3) the plaintiff stated that she only yielded to the search because she "understood that she was compelled to do so"; and (4) the plaintiff continued to protest during the pendency of the search. *Id*. at 1095. Indeed, the Third Circuit found that it was a "paradigm case of 'submission to a claim of lawful authority.'" *Id.*

Similarly, in *Bostrom*, the court held that two caseworkers for the New Jersey Division of Family Services ("DYFS") were not entitled to qualified immunity from the parent-plaintiffs' § 1983 claim, which alleged that the caseworkers violated the plaintiffs' Fourth Amendment rights by conducting a warrantless search of their home. *See* 969 F. Supp. 2d at 412-13. On the night in question, the plaintiffs' adopted daughter, who had previously been placed in, and had run away from, a foster home, was located and transferred to the DYFS facility. *Id.* at 397-98. At the time she was found, the daughter had not resided in the plaintiffs' home for more than twenty-seven months, pursuant to a court order placing her in DYFS' custody. *Id.* Upon the

daughter's arrival at the DYFS facility, the two caseworkers examined her file on the agency's database, which indicated, erroneously, that the plaintiffs, rather than DYFS, had custody over the daughter. *Id.* at 399. Although the caseworkers were aware that the information contained in the database was often inaccurate, they failed to take any actions to confirm the veracity of the information pertaining to the daughter's custody. *See id.* at 399-400.

The caseworkers subsequently called the plaintiffs to inform them that their daughter had been found, and that she would be returned to the plaintiffs' home. *Id.* at 399. The plaintiffs responded by informing the caseworkers that a court order was in place preventing the daughter from returning to their home, and urged the caseworkers to review the daughter's file to clarify the custody issue. *Id.* at 399-400. The plaintiffs also explained that they feared for the safety of their other children if the daughter returned home. *Id.* The caseworkers replied by berating the plaintiffs with profanities and questioning their fitness as parents, and stated "if you don't let us drop your daughter off . . . we will be coming to your home to make sure your boys are still breathing." *Id.* at 400. After the caseworkers hung up, the plaintiffs called the township and state police for assistance, and "[b]oth police departments informed them that they would have to let DYFS into their home and that if they refused, [the police] would assist DYFS and make them open their door." *Id.*

The caseworkers arrived at the plaintiffs' home at approximately 1:00 a.m., accompanied by two police officers that the caseworkers had summoned to assist them. *Id.* at 402. The father intercepted the officials outside of the front door of the home, where one of the caseworkers informed the father that they did not need a warrant to search the home. *Id.* When the father asked if the search was necessary, the caseworker responded, "I am doing this," and asked the father to open the door. *Id.* The father replied, "It doesn't appear that I have a choice," and

opened the door. *Id.* The father later testified that he felt that he "had no choice but to open the door to my house because I did not know my exact rights." *Id.* The caseworkers then entered the home and conducted a search of the premises and the plaintiffs' minor children. *Id.* at 402-03.

In holding that the caseworkers were not entitled to qualified immunity on the plaintiffs' Fourth Amendment warrantless search claim, the *Bostrom* court found, first, that genuine issues of material fact existed regarding whether the father consented to a search of the house. *Id.* at 406-07. In that regard, the court found that a reasonable jury, viewing the facts in the light most favorable to the plaintiffs, could conclude that the father "only allowed Defendants into his home because he was submitting to a claim of lawful authority." *Id.* at 407. In finding that a reasonable jury could conclude the consent was coercively obtained, the court noted the following facts:

> Mr. Bostrom testified that he met the Defendants outside his home and asked if the search was necessary. Defendant Schuh allegedly responded that the search would happen and it was necessary. Two uniformed and armed Human Services Police Officers, McCloy and Torres, were present with the DYFS case workers which gave them a visible claim of authority. Mr. Bostrom testified that he told the Defendants that he understood he did not have a choice and was required to let them in. Mr. Bostrom was never informed that he could refuse the Defendants' request to enter his home.
>
> . . .
>
> [T]he Plaintiffs called the municipal police and the state police inquiring about their ability to prevent DYFS from searching their home. Both police departments told the Plaintiffs they could not refuse the search. Although these statements would be hearsay if offered for the truth of their contents, here the statements are offered as information learned by Mr. Bostrom that informed his decision to not refuse entry. When caseworkers arrived at 1:00 AM with two uniformed, armed officers, Stephen Bostrom again inquired whether the search was necessary. He was told by Defendant Schuh that the search would be done. Stephen Bostrom then commented that he did not have a choice and could not refuse the search. It was only after this dialogue that Defendants were allowed into the home.

*Id.* at 406-07.  Accordingly, because the father expressly indicated that he was only submitting to the search because he felt compelled to do so in the face of a visible claim of lawful authority, the court found that genuine issues of fact existed as to whether the consent was voluntary.  *Id.* at 407.

Second, the court relied on *Good* to find that no reasonable official in the caseworkers' position would have concluded that a warrantless search of the plaintiffs' home was lawful.  *Id.* at 410-11.  To that end, the court framed that the relevant inquiry, at the clearly established prong of the qualified immunity analysis, as was whether it would have been clear to a reasonable official, in the factual circumstances confronting the caseworkers, that a warrantless search of the plaintiffs' home was unlawful.  *Id.*  The court observed that the factual circumstances in that case corresponded substantially to those in *Good*, and, at the time of the caseworkers' conduct, it was well established, under *Good*, that "a warrantless search of a home cannot be conducted by a social worker absent consent or exigent circumstances."  *Id.* at 411.  The court found that, under *Good* and general precedent pertaining to voluntary consent, no reasonable officer could conclude that the father's consent, which was offered in the face of a claim of lawful authority and under express protest, was voluntarily given.  *Id.* at 413 ("[N]o reasonable case worker in Defendants' position would have believed that a search of this residence . . . was permitted by the Fourth Amendment.").

While both *Good* and *Bostrom* concern warrantless searches conducted by social workers, those cases are distinguishable from the instant matter in several significant respects, and thus, neither case clearly establishes that the search conducted by Defendant in this case was unlawful.  First, the factual differences between this case and the circumstances present in *Good* and *Bostrom* are abundant, rendering those cases inapposite on the issue of consent to search.

Importantly, unlike in both *Good* and *Bostrom*, where the caseworkers obtained consent from the homeowners in the presence of police officers, here, consent was obtained by Chief Scott while Defendant was outside in her vehicle. Additionally, while the caseworkers in *Good* and *Bostrom* requested the presence of police officers, in this case, Plaintiffs themselves summoned Chief Scott, an officer with whom Plaintiffs were already familiar. Moreover, in both *Good* and *Bostrom*, it was clear that consent was procured under a claim of lawful authority, because the officials affirmatively stated that they would be conducting the search, and that they had authority to enter the home without a warrant. Conversely, here, while Mr. Zimmer testified that he "believe[d] [Chief Scott] said to us something about she will come in and ask you a few questions or something along those lines," Zimmer, Sr. Dep. 28:14-16, and "advised them that it would be a lot easier to let [Defendant] in," *id.* at 45:17-46:5, those statements do not amount to an affirmative claim of lawful authority to enter the home. Even if they did, they were offered outside of the presence of Defendant, and, because nothing in the record suggests that Chief Scott apprised Defendant of making those statements in obtaining Plaintiffs' consent, the Court cannot impute knowledge of those statements to Defendant in determining whether a reasonable official in Defendant's position could reasonably believe that Plaintiffs consented to the entry.

Furthermore, the actions following the communication of consent from Chief Scott to Defendant distinguish the instant matter from *Good* and *Bostrom*. In that regard, in both *Good* and *Bostrom*, the consent was obtained in the presence of all police officers and caseworkers on the scene, and the police officers remained present at the respective homes until the search was completed. Here, by contrast, Chief Scott departed the scene after relaying the consent to Defendant, and Mr. Zimmer then allowed Defendant to enter the home without any verbal or non-verbal indication that he was not consenting to her entry. Once inside the home, Defendant

received permission from Mr. Zimmer to sit at the dining room table, and Plaintiffs acquiesced to Defendant's subsequent questioning without further protesting the search. Furthermore, unlike in both *Good* and *Bostrom*, following Chief Scott's conveyance of consent, Plaintiffs never expressly indicated to Defendant that they only consented to the search because they felt compelled to do so. Under these circumstances, the Court cannot find that a reasonable official in Defendant's position would have known, as a result of either *Good* or *Bostrom*, that entry into Plaintiffs' home was unlawful.

The Court also finds that, within the context of warrantless home searches, the law regarding the validity of consent communicated from one official to another is not clearly established. To that end, the parties have not identified, and the Court has not located in its own review, any case establishing that, where one official conveys to a second official that an occupant has consented to a search, the second official must verify the authenticity of that consent. More specifically, the Court has not found any such case where, as here, the occupant takes no subsequent action to indicate that he or she did not voluntarily consent, or has withdrawn consent.[9] To the contrary, at least one circuit court has recognized that an official is qualifiedly immune from Fourth Amendment claims when the official reasonably relies on

---

[9] In so finding, the Court reiterates that its inquiry, for qualified immunity purposes, is whether a reasonable official in Defendant's position could objectively believe that that a warrantless entry into Plaintiffs' home, under the information possessed by Defendant and in light of clearly established law, was lawful. Thus, while the Court acknowledges that in some instances, an official's non-presence at the time of consent *may* require the official to confirm the voluntariness of consent with an occupant prior to entry, I find that it was not clearly established, under the circumstances in this case, - where Chief Scott relayed consent, Defendant immediately proceeded to the Plaintiffs' home, and Plaintiffs took no subsequent actions to indicate that their consent was involuntary – that a warrantless entry into the home was unlawful. Stated differently, a reasonable official in Defendant's position would not have been on clear notice that Defendant's consent was involuntary, or that entering the house without verifying consent would render the search unlawful.

information conveyed by another official to enter private property without a warrant, and this Court has not located any Third Circuit decision holding otherwise. *See Washington Square Post No. 1212 Am. Legion v. Maduro*, 907 F.2d 1288, 1293 (2d Cir. 1990) (finding that officials were qualifiedly immune from the plaintiffs' Fourth Amendment warrantless search claim, because the officials were "entitled to rely on the reasonable instructions of their superior in the chain of command [that no warrant was needed to enter the establishment], particularly where those instructions were not inconsistent with their personal knowledge and experience."); *see also Scott v. City of Mount Vernon*, No. 14-4441, 2017 WL 1194490, at *30 (S.D.N.Y. Mar. 30, 2017) (finding that officials were entitled to qualified immunity on the plaintiff's Fourth Amendment warrantless search claim, because "[n]o reasonable trier of fact could conclude that every reasonable official would know that [the official's] decision to follow the orders of their superior and enter the Apartment (and remain there for some time), where other officers were already present, was a violation of Plaintiffs' Fourth Amendment rights.").[10]

In sum, I find that while it was clearly established, at the time of Defendant's conduct, that a social worker generally cannot conduct a warrantless home search without consent, here,

---

[10] More generally, courts have found that officials are entitled to qualified immunity from constitutional claims when they reasonably rely on information from other officials to engage in constitutionally protected conduct. *See Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) (finding that officers were entitled to qualified immunity from a warrantless seizure claim, where, based on the totality of the circumstances, the officers reasonably relied on a superior officer's order to seize the plaintiff); *Bilida v. McCleod*, 211 F.3d 166, 174–75 (1st Cir. 2000) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances)."); *see also Heicklen v. Toala*, No. 08-2457, 2010 WL 565426, at *6 (S.D.N.Y. Feb. 18, 2010), *aff'd sub nom. Heicklen v. Kelly*, 409 F. App'x 457 (2d Cir. 2011) ("Even if the defendant Toala did not actually have probable cause to arrest, given the plausible orders from Lieutenant Wolf and his own observation of all of the circumstances, defendant Toala reasonably could have concluded that probable cause existed. Therefore, defendant Toala was protected by qualified immunity in this case.").

based on the circumstances confronting Defendant, a reasonable official would not have known that entering Plaintiffs' home violated the Fourth Amendment. Unlike in *Good* and *Bostrom*, where consent was clearly obtained under the threat of lawful authority, and the occupants expressly indicated to the caseworkers that they consented only because they felt compelled to do so, here, consent was obtained by Chief Scott outside of Defendant's presence and relayed to Defendant, and, during Defendant's second encounter at the home, Plaintiffs did not take any actions to indicate that their consent was involuntary. Thus, while the *Good* and *Bostrom* courts found that the general standards governing the voluntariness of consent would have placed any reasonable official on notice that the consent was coercively obtained, here, as in *Anderson*, looking solely to the broad standards governing consent would run afoul of the Supreme Court's instruction to define the clearly established right with particularity, as well as fail to account for the objective reasonableness of Defendant's actions. *See al-Kidd*, 563 U.S. at 742; *Pauly*, 137 S. Ct. at 551–52.

Rather, I find that under the facts of this case, a reasonable official, armed with knowledge of the standards governing warrantless searches and voluntary consent, could nonetheless have been reasonably mistaken as to whether Plaintiffs consented to the entry. *See Kornegay v. Cottingham*, 120 F.3d 392, 395–96 (3d Cir. 1997) ("Qualified immunity turns on the reasonableness of the officers' belief that their conduct was legal not its legality *per se*."). To that end, this Court has found neither a factually analogous Supreme Court decision, nor a robust consensus of persuasive authority in the Court of Appeals, that clearly established the unconstitutionality of Defendant's conduct as of January 13, 2015. To the contrary, reasonable minds could differ as to whether Plaintiffs consented to Defendant's entry under the circumstances, and the law pertaining to consent communicated by one official to another was

not clearly established at the time of Defendant's conduct. Accordingly, because I cannot find that every reasonable caseworker in Defendant's position would have understood that Defendant's conduct violated Plaintiffs' Fourth Amendment rights, Defendant is entitled to qualified immunity.

### C. NJCRA Claim

In Count Six of the Complaint, Plaintiffs allege that Defendant's warrantless entry into their home violated the New Jersey Civil Rights Act because it was not conducted pursuant to Plaintiffs' voluntary consent. The NJCRA[11] was modeled after § 1983, and thus, courts in New Jersey have consistently looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011); *Chapman v. New Jersey*, No. 08–4130, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart . . . ."); *Armstrong v. Sherman*, No. 09–716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 . . . ."). Accordingly, Plaintiffs' NJCRA claim will be interpreted analogously to their § 1983 claims. *Trafton*, 799 F. Supp. 2d at 443–44; *see Hedges v. Musco*, 204 F.3d 109, 121 n. 12 (3d Cir. 2000) (concluding New Jersey's

---

[11] The NJCRA "creates a private cause of action for violations of civil rights secured under the New Jersey Constitution." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). Specifically, the NJCRA provides, in pertinent part, a private cause of action to:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law . . . .

N.J.S.A. 10:6-2(c).

constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment).  Because the Court has concluded that Defendant had an objectively reasonable belief that Plaintiffs voluntarily consented to her entry, and that Defendant is nonetheless entitled to qualified immunity, Plaintiffs' NJCRA claim alleging that Defendant conducted an unreasonable search also fails.  Accordingly, summary judgment is granted in favor of Defendant on Plaintiffs' NJCRA claim.

## V.     CONCLUSION

Because Defendant's belief that Plaintiffs voluntarily consented to Defendant's entry into their home was objectively reasonable, in light of the totality of the circumstances confronting Defendant, I conclude that Defendant's entry did not violate the Fourth Amendment's prohibition against unreasonable searches.  Additionally, I find that Defendant is entitled to qualified immunity, because an objectively reasonable official, provided with the information possessed by Defendant and in light of clearly established law at the time of Defendant's conduct, would not have known that Defendant's entry was unlawful.  Accordingly, Defendant's Motion for Summary Judgment is GRANTED, and Plaintiffs' Cross-Motion for Summary Judgment is DENIED.


Dated:  October 26, 2017                                    /s/ Freda L. Wolfson
                                                           Hon. Freda L. Wolfson
                                                           United States District Judge